UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-29-16

MARC J. RIDDICK,

          Plaintiff,

     - against -

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

:
:
:
:
:
:
:
:
:
:
:

**ORDER AND OPINION**

**14-CV-8453 (RLE)**

**RONALD L. ELLIS, United States Magistrate Judge:**

Plaintiff Marc Riddick ("Riddick") commenced this action under the Social Security Act

(the "Act"), 42 U.S.C. § 406(g) and/or 42 U.S.C. § 1383(c)(3), challenging a final decision of the

Commissioner of Social Security (the "Commissioner") denying his claim for Social Security

Disability ("SSD") and Supplemental Security Income ("SSI"). Riddick argues that the decision

of the Administrative Law Judge ("ALJ") was erroneous and not based on substantial evidence.

On January 1, 2015, the Parties consented to the jurisdiction of the undersigned for all

proceedings pursuant 28 U.S.C. § 636(c). On May 18, 2015, the Commissioner moved for a

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking

the Court to affirm the Commissioner's decision and dismiss the Complaint. (Mem. of Law in

Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Mem.").) On August 18, 2015, Riddick

cross-moved for judgment on the pleadings, seeking remand of this action to the Commissioner

for additional proceedings. (Mem. of Law in Supp. of Pl.'s Cross-Mot. for J. on the Pleadings

("Pl.'s Mem.").) For the reasons set forth below, the Commissioner's motion is **DENIED,**

Riddick's motion is **GRANTED**, and the case is **REMANDED** to the Commissioner for further

development of the record.

## I.     BACKGROUND

### A.     Procedural History

On March 3, 2013, Riddick applied for SSD and SSI. (Tr. of Admin. Proceedings ("Tr.")

at 70-82.)  He claimed a disability onset date of March 23, 2011. (*Id.* at 96.) His application was

denied on May 3, 2013. (*Id.* at 58.) Riddick appeared before ALJ Michael Dominic Cofresi

("ALJ Cofresi" or "the ALJ") on December 11, 2013, without representation. (*Id.* at 23, 25.) The

ALJ issued a decision on January 21, 2014, finding that Riddick was not disabled within the

meaning of the Act and was not entitled to disability benefits. (*Id.* at 6.) Review by the Appeals

Counsel was automatically requested on January 22, 2014. (*Id.* at 5.) On September 14, 2014, the

Appeals Counsel denied Riddick's request for review and ALJ Cofresi's decision became the

Commissioner's final decision. (*Id.* at 1.) Riddick, now represented by counsel, filed this action

on October 21, 2014. (Doc. No. 1.)

### B.     ALJ Hearing and Decision

#### 1.     Administrative Hearing Testimony and Other Sworn Statements

ALJ Cofresi conducted a fourteen-minute hearing on December 11, 2013. (Tr. at 25, 39.)

On the date of the hearing, Riddick was 49 years old and had a high school diploma. (*Id.* at 35.)

He resided at Phoenix House, where he had been living and participating in a residential drug

treatment program for the previous fifteen months. (*Id.* at 26.) Riddick explained that he had

previously used drugs and was addicted to alcohol but that he had not used drugs in the previous

three years. (*Id.* at 27.) He had also stopped drinking since he had been living in Phoenix House,

although he had used alcohol once, three months earlier. (*Id.* at 27-28.)  Until 2009, he had

worked as a garbage collector for a private sanitation company, where he would routinely lift

objects weighing more than one hundred pounds. (*Id.* at 31, 98.)  He lost that job when his

employer "lost the contract" under which he was employed. (*Id.* at 31.) Riddick collected

unemployment benefits until around April 27, 2013, when he began working part time as a cook at Key Food Supermarket. (*Id.* at 28.), Riddick explained, however, that he has a "hip ailment" and has become "immune" to his pain medication, and as a result is in constant pain whether he is sitting, standing, or sleeping. (*Id.* at 36.)

On his disability application, completed in March 2013, Riddick listed "right hip replacement" as a condition that limited his ability to work. (*Id.* at 96.) At the hearing, he testified that he had been to the Hospital for Special Surgery on November 20, 2013, and had asked a doctor about "a hip replacement." (*Id.* at 31-32.) Citing Riddick's age and condition, the doctor advised against hip replacement. (*Id.* at 32) Riddick testified that he was in constant pain when sitting, standing, and lying down, and that he would experience a sharp pain in his hip when bending. (*Id.* at 36.) He indicated that "[e]very day [he is] in pain." (*Id.* at 38.) His doctor proscribed Mobic to manage the pain but Riddick testified that he had become "immune" to the medication "as time progress[ed]." (*Id.* at 33.) He acknowledged nevertheless that he had done "some damage to [his] body" with "work, drugs, and stuff." (*Id.*)

In addition to the problems with his hip, Riddick claimed that his ability to work was limited by high blood pressure, Hepatitis C, asthma, acid reflux, bronchitis, and tuberculosis. (*Id.* at 96.) He also alleged that he had "fractured wrists," which made it difficult to lift. (*Id.* at 110.) In addition to Mobic to manage the pain in his hip, he takes medication to control his high blood pressure. (*Id.* at 33.) As of the date of the hearing, Riddick was not taking the medication that his doctor had proscribed to manage his Hepatitis C because of the side effects, explaining that it "[made him] drowsy, as if he was back on drugs." (*Id.*) He had approximately one asthma attack a month, and carried his "pump" with him. (*Id.* at 37.) He said that he was supposed to use it twice per day, but tried to use it only once. (*Id.*) Riddick also had a nebulizer that he had used

around three times in the past fifteen months. (*Id.*) He testified that the conditions in the kitchen

at Key Food did not trigger his asthma because it was well ventilated and he worked near the

walk-in refrigerator which "brings in the air." (*Id.*)

Riddick testified that on an average day he was able to cook; clean; shop for groceries; do

laundry; and bathe, dress, and feed himself. (*Id.* at 35.) At the time of the hearing, he worked at

Key Food five hours a day, six days a week. (*Id.* at 34.) While he was there, he was on his feet

for most of his shift, standing and walking. (*Id.*) He infrequently had to lift. (*Id.*) At most, he

said, he would lift a rack of chickens weighing around ten pounds. (*Id.*) To get to work, he took

two busses and a train and said that he only had trouble in "cold weather." (*Id.* at 35.) He

testified that he could walk about half a mile or for about an hour. (*Id.* at 36.) In a function

report, completed in March 2013 as part of his initial application for disability benefits, he wrote

that he needed a cane for walking long distances, that he could walk about eight blocks before he

needed to stop and rest, and that he could only walk for twenty to thirty minutes. (*Id.* at 112.) He

also wrote that he could not sit still for long periods of time; would get winded climbing stairs;

and was unable to kneel, squat, or fully bend. (*Id.* at 111.) He testified that he did not engage in

many social activities and that he preferred to read. (*Id.* at 35.) In his function report, he wrote

that he would meet daily in groups, and helped cook and prepare meals at the treatment center.

(*Id.* at 110.) He tried to go to church twice a week. (*Id.*)

### 2.    Medical Evidence

#### a.    Sandra Brown-Truter, N.P.

The record contains notes from Phoenix House for two physical examinations by Nurse

Practitioner Sandra Brown-Truter ("NP Brown-Truter"). (*Id.* at 146-47, 168-69.) The first

examination notes, dated August 20, 2012, indicated that Riddick's current complaints were hip

pain and insomnia. (*Id.* at 146.) NP Brown-Truter listed three current medications: 25mg daily of

hydrochlorothiazide, for high blood pressure; 150mg of Zantac twice a day, for acid reflux; and

15mg daily of Mobic daily, an NSAID (non-narcotic) pain reliever.[1] (*Id.* at 147.) She indicated

that Riddick's last PPD test, for tuberculosis, was negative. (*Id.*) After a review of his systems,

she wrote that he had occasional chest pain and right hip pain. (*Id.*) NP Brown-Truter placed a

mark next to each of the following activities, although it is unclear[2] whether she intended to

indicate that Riddick had limitations in them: walking, stooping, reaching, standing, pulling,

lifting, pushing, kneeling; working inside and outside; working in either humid, dry, or dusty

conditions; or working in sudden temperature changes. (*Id.* at 149.) At the end of the physical,

she recommended that Riddick continue his course of medications, add 81mg of aspirin daily for

his hypertension, take Benadryl for his insomnia, and consider stop smoking. (*Id.*)

The second examination notes were taken just three weeks later, on September 4, 2013.

(*Id.* at 171.) NP Brown-Truter wrote that Riddick was "awaiting ortho appointment." (*Id.* at 168.)

His current complaint was "hip pain." (*Id.*) She wrote "see med sheet" for a list of current

medications, but the "med sheet" is not included in the record. (*Id.*) She again indicated that

Riddick was experiencing right hip pain. (*Id.* at 169.)   NP Brown-Truter recommended that

Riddick continue his current medication for hypertension, cease smoking, and see an orthopedic

specialist for his hip pain. (*Id.* at 171.)

          **b.**        **Jamaica Hospital Medical Center**

The record contains the results of five radiology examinations performed between

November 2010 and March 2011: MRI's in December 2010 and March 2011, an upper GI series

---

[1] The generic name for Mobic is meloxicam. 2 Attorneys Medical Deskbook § 26:27.10.

[2] The form directed the provider to place a check mark to indicate "no limitation," an "x" to indicate some limitation, or an "o" to indicate that the activity is "to be avoided." (*Id.* at 149.) Rather than any of these symbols, NP Brown-Truder placed a line next to each item. (*Id.*)

in December 2010, and chest x-rays in November 2010 and March 2011. (*Id.* at 140-44, 182-87.)

The x-rays and GI series were normal. (*Id.* at 144, 184, 187.) The MRI on December 6, 2010

indicated an abnormality on Riddick's left femoral head which raised the possibility avascular

necrosis—bone tissue death caused by a lack of blood supply, which can lead to tiny breaks in

the bone and the bone's eventual collapse[3]—although the "femoral head contour [was]

maintained." (*Id.* at 185) The MRI also revealed "moderate degenerative changes of the hips,"

the formation of osteophytes, joint space narrowing, and bone cysts, all characteristics of

osteoarthritis.[4] The test also showed that there was fluid buildup in the bone marrow of the right

hip socket, and that the hip socket was extending into the pelvic bone. (*Id.*) The fluid, plus

irregularity on the surface of the pelvic bone, raised the "suspicion of fracture." (*Id.*) The doctor

noted "bilateral hip degenerative changes," and recommended that Riddick have another MRI

done in the future for comparison. (*Id.*)

A second MRI, on March 23, 2011, noted that there was no fracture or dislocation. (*Id.* at

142.) There was, however, hardening of the bone in the hip socket, as well as an irregular

contour of the femoral neck, which suggested femoroacetabular impingement, a condition that

causes the hip bones to rub against each other and cause damage to the joint.[5] (*Id.*) The doctor

found "moderate osteoarthrosis, grossly unchanged." (*Id.* at 143.)

### c.    Hospital for Special Surgery

The record contains a November 20, 2013 imaging study of Riddick's hip, dictated by

Carolyn Sofka, M.D., of the Hospital for Special Surgery Department of Radiology and Imaging,

---

[3] *See Avascular necrosis*, MAYO CLINIC (Mar. 21, 2015), http://www.mayoclinic.org/diseases-conditions/avascular-necrosis/basics/definition/con-20025517.
[4] *See* Thomas J. Schnitzer, *Osteoarthritis (Degenerative Joint Disease)*, *in* CECIL TEXTBOOK OF MEDICINE 1550, 1550-52 (Lee Goldman, M.D., and J. Claude Bennet, M.D., eds. 2003).
[5] *Femoroacetabular Impingement (FAI)*, ORTHOINFO (Sept. 2010), http://orthoinfo.aaos.org/topic.cfm?topic=A00571.

which indicated bilateral hip osteoarthritis greater in the right hip than the left, with moderate shifting of the right femoral head. (*Id.* at 190, 193.)  The imaging study was ordered by Physician Alejandro Leali. (*Id.* at 190.)

### d.   Iqbal Teli, M.D. – Consultative Examination

Iqbal Teli, M.D., examined Riddick on April 22, 2013, as a consulting physician for the Commissioner. (*Id.* at 163-4.) Dr. Teli wrote that Riddick's "chief complaint" was a history of hepatitis C. (*Id.* at 162.) He also wrote that Riddick had a history of both asthma and hypertension "since 2010." (*Id.*) Dr. Teli listed Riddick's current medications as: ProAir Inhaler as needed; Hydrochlorothiazide 25mg daily; and Pegasys ProClick injection 180 mcg once a week. (*Id.*) Dr. Teli described Riddick's social history of smoking since the age of thirteen, heavy drinking, and heroin abuse. (*Id.*) He noted that Riddick continued to smoke ten cigarettes a day, but stopped drinking in 2012 and using heroin in 2010. (*Id.*) Riddick reported cooking and cleaning three times a week; showering six times a week; and dressing seven times a week. (*Id.*)

Dr. Teli completed a physical examination of Riddick and noted that Riddick "appeared to be in no acute distress." (*Id.* at 163.) Dr. Teli also noted that Riddick's gait and stance were normal, that he could "walk on heels and toes without difficulty," and that he could squat at "75%." (*Id.*)  He further noted that Riddick used no assistive devices, "needed no help changing for exam or getting on and off [the] exam table," and was "able to rise from [the] chair without difficulty." (*Id.*) An examination of Riddick's musculoskeletal system showed full flexion, extension, range of motion, in the spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles. (*Id.*) In addition, Riddick's joints were "stable and nontender." (*Id.* at 164.) The only abnormality Dr. Teli noted was "bony swelling of both wrists." (*Id.*) Examination of all other systems showed normal results. (*Id.* at 163-64.)

Dr. Teli diagnosed Riddick with history of hepatitis C, bronchial asthma and hypertension, with a "stable" prognosis." (*Id.* at 164.) He concluded that Riddick should "avoid dust and other asthma irritants due to history of asthma." (*Id.*)

### 3.    The ALJ's Findings

On January 21, 2014, ALJ Cofresi issued a decision, finding that Riddick was not disabled within the meaning of sections 216(i), 223(d), and 1614(a)(3)(A) of the Act, and had not been disabled since March 23, 2011, the date he alleged the onset of his disability, through the date of the decision. (*Id.* at 11.)  ALJ Cofresi found that although Riddick was employed at Key Food, his monthly earnings of approximately $960 did not reach the substantial gainful activity threshold of $1,040 per month, and therefore Riddick had not engaged in substantial gainful activity during the period at issue. (*Id.* at 13, citing POMS DI 10505.015.) He then found that Riddick suffered from two severe impairments, bilateral hip osteoarthritis and asthma, but did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the listings"). (*Id.* at 13-14.) ALJ Cofresi found that Riddick retained the residual functional capacity ("RFC") to perform the full range of sedentary work. (*Id.* at 15.) Although he was unable to perform his past work as a garbage collector (*Id.* at 17.), considering Riddick's age, education, and RFC, there were jobs in significant numbers in the national economy that he could perform. (*Id.* at 18.) ALJ Cofresi, therefore, denied Riddick's claim. (*Id.* at 19.)

ALJ Cofresi explained that the record did not document "a musculoskeletal impairment severe enough to meet the requirements" of the listings. (*Id.* at 14.) He found that there was "no evidence of the inability to ambulate effectively" or to "perform fine and gross movements effectively." (*Id.*) Furthermore, the record did not contain required medical findings such as

"nerve root compression," "motor loss," "sensory or reflex loss, "or positive straight leg raise

testing," and "also no evidence of spinal arachnoiditis." (*Id.*) He similarly found that the record

did "not document a respiratory system disorder severe enough to meet the requirements" of the

listings. (*Id.*) The record did not contain any pulmonary tests or evidence of regular "asthma

attacks, in spite of prescribed treatment and requiring physician intervention." (*Id.* at 14-15.)

Next, the ALJ considered Riddick's symptoms, and determined that he retained the RFC

for the full range of sedentary work. (*Id.* at 15.) In considering the symptoms, the ALJ described

a "two-step process," in which he first determined "whether there is an underlying medically

determinable physical or mental impairment(s)" that could "reasonably be expected to produce

[Riddick's] pain or other symptoms[.]" Second, the ALJ stated that he considered the "intensity,

persistence, and limiting effects of [Riddick's] symptoms" and "the extent to which they limit"

his functioning. (*Id.*) ALJ Cofresi determined that, although Riddick's medically determinable

impairments could reasonably be expected to cause the "alleged symptoms," his "statements

concerning the intensity, persistence, and limiting effect of these symptoms [were] not entirely

credible." (*Id.*)

Specifically, the ALJ found that Riddick has "intact activities of daily living," noting that

he testified that he works in the kitchen at both at Key Food and Phoenix House as part of his

rehabilitation program, attends groups, and prepares meals, sweeps, mops, and does laundry.

(*Id.*) Riddick spends five hours of his workday standing or walking, carries trays of chickens

weighing up to ten pounds, and earns $240 per week. (*Id.*) He further noted that Riddick is able

to get to work by traveling on two buses and the train. (*Id.*) Although in his function report,

Riddick noted difficulty bending and dressing, he testified that he has "no difficulty dressing and

bathing," and "the record contains no ongoing complaints of difficulty with personal care." (*Id.*

at 16.)The ALJ further found that the consultative physical examination was "entirely normal" and "treating examinations were also normal." (*Id.*) He noted that "physical examinations were generally normal with full strength, sensation, and reflexes in all aspects of the musculoskeletal system." (*Id.*) He specifically found "no imaging or ongoing complaints of wrist/hand pain." (*Id.*)

Addressing Riddick's need for a "right hip replacement," ALJ Cofresi wrote that Riddick "ha[d] not received the type of treatment one would expect for a disabled individual," and had been to the Hospital for Special Surgery[6] only once, two weeks before the hearing, and "was advised that hip replacement surgery was not needed." (*Id.*) He also noted that Riddick "testified to no further treatment with this provider" and that the record contained "no other recommendations for hip surgery." (*Id.*) He noted that Riddick's medications "are not unusual in type or dosage and they appear effective," commenting that Riddick "only takes Mobic for hip pain with no side effects." (*Id.*) Additionally, the ALJ found that Riddick's asthma only caused problems "every now and then" and that his work environment did not affect his condition. (*Id.*) He also explained that Riddick's history of hepatitis C, hypertension, acid reflux, drug and alcohol addiction, and positive PPD tests did not cause more than minimal limitations to his work activity. (*Id.* at 14.)

ALJ Cofresi next considered the opinions of consultative physician Dr. Teli and treating provider NP Brown-Truter. (*Id.* at 17.) The ALJ gave Dr. Teli's opinion that Riddick "should avoid dust and other irritants" "limited weight because the record reflect[ed] no significant difficulty due to asthma irritants." (*Id.*) He also noted that Dr. Teli performed a physical examination that revealed that Riddick was "entirely normal," except for the limitation of "squat

---

[6] The ALJ incorrectly identified the hospital as the Hospital for Joint Diseases. (Tr. at 31.)

75 percent." (*Id.*)  He noted that NP Brown-Truter "opined that claimant ha[d] no limitation in walking, stooping, reaching, standing, pulling, lifting, pushing or kneeling," and no limitations in his working conditions. (*Id.*) He gave her opinion "some weight because it [was] supported by the normal examination findings" and was consistent with the overall record.  (*Id.*)

In making his determination that Riddick retained an RFC for sedentary work, the ALJ noted that "the record reflect[ed] no opinions from treating or examining physicians indicating that the claimant is disabled or even has exertional limitations greater than those determined in the decision." (*Id.*) In fact, he noted that Riddick was "currently working at a greater exertional level than as found in this decision." (*Id.*)  "Nevertheless, based on the totality of the evidence," the ALJ found that Riddick was "limited to at least sedentary work due to bilateral hip osteoarthritis causing pain and shortness of breath on exertion related to asthma." (*Id.*)

Considering that Riddick was a "younger individual" with at least a high school education, the ALJ used the Medical-Vocational Guidelines to determine that Riddick was not disabled. (*Id.* at 18-19 citing 20 C.F.R., Part 404, Subpart P, App'x. 2.)

## C.    Appeals Counsel Review

Riddick requested review by the Appeals Counsel on January 22, 2014.[7] (*Id.* at 5.) He submitted additional evidence, most of which related to the period after the ALJ's January 2014 decision.[8] (See *id.* at 4, 194-199.) The only evidence that Riddick submitted that was within the period at issue was a duplicative copy of the imaging study from the Hospital for Special Surgery dated November 20, 2013. (*Id.* at 193.) The Appeals Counsel denied review on September 14,

---

[7] ALJ Cofresi is one of several administrative law judges whose decisions were challenged in the class-action lawsuit *Padro, et al. v. Colvin.* (*Id.* at 6.) Under the terms of the settlement of that case, all of ALJ Cofresi's opinions are subject to special review procedures, including automatically deeming review "requested" by claimants. (*Id.*)
[8] The post-decision records include notes from a fluoroscopic guided injection in his right hip at the Hospital for Special Surgery on July 28, 2014 (*Id.* at 194-95.), and treatment notes from Nurse Practitioner Edith Ogbenna at the Damien Family Health Center on June 12, 2014. (*Id.* at 199.)

2014, and the ALJ's decision became the final decision of the Commissioner. (*Id.* at 1.)

## III. DISCUSSION

### A. Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); accord *Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); accord *Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); accord *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). See, e.g., *Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42

U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); accord *Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. See *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d

Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008)

(overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002

WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409

(reconsideration of improperly excluded evidence typically requires remand). Eschewing rote

analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any

determination . . . with sufficient specificity to enable the reviewing court to decide whether the

determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250,

269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

When "new and material evidence" is submitted, the Appeals Council may consider the

additional evidence "only where it relates to the period on or before the date of the administrative

law judge hearing decision." 20 C.F.R. § 404.970(b). "New evidence" refers to "any evidence

that has not been considered previously during the administrative process." *Shrack v. Astrue*,

608 F. Supp. 2d 297, 302 (D. Conn. 2009).

## B. Determination of Disability

### 1.  Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is

entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as

an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at

§§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A

claimant's impairments must be "of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the

Commissioner is required to conduct the following five-step inquiry: (1) determine whether the

claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the

claimant has a "severe impairment" that significantly limits his or her ability to do basic work

activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the

regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not,

determine whether the claimant possesses the RFC to perform his past work despite the

disability; and (5) if not, determine whether the claimant is capable of performing other work.

20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F.

Supp. 2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at

the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant

is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*,

692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the

Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a

disability exists if the claimant proves that his or her severe impairment meets or medically

equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the

Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R.

§§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-

9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. If so, then the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ has "discretion in weighing the credibility of the claimant's testimony in light of the other evidence of record." *Genier*, 606 F.3d at 49 (citing *Marcus v. California*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (requiring that a claimant's allegations be "consistent" with medical and other evidence); *Briscoe v. Astrue*, No. 11 Civ. 3509 (GWG), 2012 WL 4356732, at *16-19 (S.D.N.Y. Sept. 25, 2012) (reviewing an ALJ's credibility determination). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

## 2.  The Commissioner's Duty to Develop the Record

The ALJ generally has an affirmative obligation to develop the administrative record. 20 C.F.R. § 404.1512(d); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). Under the Act, the ALJ must "make every reasonable effort to obtain from the individual's treating physician ... all medical evidence, including diagnostic tests, necessary in order to properly make" a determination of disability. 42 U.S.C. § 423(d)(5)(B). Furthermore, when the claimant is unrepresented by counsel; the ALJ "has a duty to probe scrupulously and conscientiously into and explore all relevant facts . . . and to ensure that the record is adequate to support his decision." *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999), citing *Dechirico v. Callahan*, 134 F.3d 1177, 1183 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996). Remand to the Commissioner is appropriate when there are "obvious gaps" in the record and the ALJ has failed to seek out additional information to fill those gaps. *See Lopez v. Comm'r of Soc. Sec.*, 622 Fed. Appx. 59 (2d Cir. N.Y. 2015), citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

## C.  Issues on Appeal

In the current action, Riddick argues that the case should be remanded to the Commissioner because (1) the ALJ failed his affirmative obligation to develop the administrative record; and (2) a May 14, 2015 letter from Dr. Leali, of the Hospital for Special Surgery, constitutes new and material evidence that warrants remand for additional consideration. The Commissioner contends that the ALJ's decision is supported by substantial evidence at each step.

Having considered the Parties' arguments and the record as a whole, the Court finds that remand is necessary for further development of the administrative record.

### 1. The ALJ Failed to Adequately Develop the Record of Riddick's Hip Impairment

In his application for disability benefits, completed in March 2013, Riddick indicated that he required a "right hip replacement" (Tr. at 95.) and, when the ALJ asked at the hearing in December 2013 why Riddick applied for benefits, he testified that it was because of his "hip ailment." (Tr. at 31.)  ALJ Cofresi, however, failed to adequately develop the record of objective medical findings with respect to Riddick's hip impairment, leaving significant gaps in the record that warrant remand.

At the hearing, Riddick told the ALJ that he had only recently been examined by a doctor at the Hospital for Special Surgery, and had inquired about hip replacement surgery. (Tr. at 32.) Riddick said of that conversation, "[the doctor] said due to my age and the condition, he doesn't advise it." (*Id.*) At the hearing, ALJ Cofresi did not develop Riddick's testimony to clarify what "the condition" meant, or why the doctor did not advise hip replacement surgery. In his decision, however, the ALJ characterized the testimony as establishing that Riddick "was advised that hip surgery was not needed" and noted that "the record reflects no other recommendations for hip surgery," before rejecting Riddick's allegations that he needed a right hip replacement. (*Id.* at 16.)

With respect to Riddick's hip impairment, the record contains the results of two MRI/CT scans, from December 2010 and March 2011, which suggest moderate arthritic degeneration in his right hip socket. (*Id.* at 140-44, 182-87.) Then, in August and September of 2012, Riddick reported to the nurse practitioner at Phoenix House that he was experiencing hip pain and insomnia, and he was referred to an orthopedic specialist. (*Id.* at 146, 168.) Next there is the

November 2013 imaging report from the Department of Radiology and Imaging at the Hospital

for Special Surgery, finding bilateral hip osteoarthritis. (*Id.* at 190.)

The record does not, however, contain any treatment notes from Dr. Leali, the physician

at the Hospital for Special Surgery who ordered the imaging report. (*Id.*) Nor are there any

records or notes related to the visit that Riddick testified occurred in November 2013, at which

he was apparently told that hip replacement surgery was not recommended. (*Id.* at 32.) The

record reflects no efforts by the ALJ to obtain these records. (See *Id.* at 145, 166 (request and

subpoena for Records from Phoenix House); 179 (subpoena for records from Weill Cornell

Medical Center); 181 (subpoena for records from Jamaica Hospital).) Nor does the record show

that he advised Riddick, who at that time was proceeding *pro se*, that it was important that he

provide such records. *See Hankerson v. Harris*, 636 F.2d 893, 896 (2d Cir. 1980) (remand was

appropriate where an ALJ failed to help a *pro se* litigant develop her case).

The ALJ was obligated to fill these gaps in the record. *See Lopez v. Comm'r of Soc. Sec.*,

622 Fed. Appx. 59 (2d Cir. N.Y. 2015), citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir.

1999). Riddick's testimony was that the doctor at the Hospital for Special Surgery "did not

advise" hip surgery because of Riddick's age and "the condition." (Tr. at 31.) Rather than being

the final word, Riddick's imprecise non-medical testimony should have suggested lines of

inquiry.

Riddick argues that in addition to requesting records from Dr. Leali, the ALJ was also

required to secure medical source statements from Riddick's treating providers to further develop

the record regarding Riddick's hip impairment. (Pl.'s Mem. at 9.) He argues that

> ... when the claimant appears *pro se*, the combined force of the treating
> physician rule and of the duty to conduct a searching review requires that
> the ALJ make every reasonable effort to obtain not merely the medical
> records of the treating physician but also a report that sets forth the

opinion of that treating physician as to the existence, the nature, and the
severity of the claimed disability.

*Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003), quoting *Peed v. Sullivan*, 778 F.

Supp. 1241, 1246 (E.D.N.Y. 1991). Riddick notes that here the ALJ found that "[t]he record

reflects no opinions from treating or examining physicians indicating that claimant is disabled,"

(*Id.* at 17.), but made no effort to obtain such opinions. (Pl.'s Mem. at 9.) To the extent that there

are no medical statements in the record that interpret Riddick's 2010 and 2011 MRIs, or the 2013

imaging study, and opine on the limitations that such impairment may impose, the Court agrees

that remand is warranted for further development. This, too, constitutes an obvious gap in the

record that the ALJ was obligated to attempt to fill before rendering a decision on Riddick's

claim.

Riddick points to one more area where he alleges the Commissioner and ALJ Cofresi

failed in their duty to develop the record. (Pl.'s Mem. at 11.) On April 22, 2013, consulting

physician Dr. Teli examined Riddick at the request of the Commissioner. (Tr. at 162.) Riddick

contends that the notes from this examination do not reflect that Dr. Teli was provided with

copies of Riddick's two MRIs to that date, which revealed osteoarthritis of the hip and,

accordingly, did not diagnose Riddick with osteoarthritis. (*See* Tr. at 164 (Dr. Teli listing

Riddick's diagnoses as "history of hepatitis C[,]" "history of bronchial asthma[,]" and "history of

hypertension").) Without this evidence available to the doctor, Riddick argues, Dr. Teli's opinion

has "no probative value with respect to his exertional capacity for sitting, standing, and

walking." (Pl.'s Mem. at 11, citing *Burgess v. Asture*, 537 F.3d 117, 132 (2d Cir. 2008)

(remanding where ALJ used opinion of a consulting physician who had not reviewed claimant's

MRI Report to discount the opinion of the treating physician).) The Commissioner, who

concedes that Dr. Teli did not have Riddick's hip-related imagery when drafting his report,

argues that the probative force of Dr. Teli's findings are not diminished by his failure to review

Riddick's MRI Reports because Dr. Teli performed his own complete physical examination of

Riddick that revealed no impairments. (Def.'s Reply Mem. of Law at 3.) The Commissioner also

infers that because Dr. Teli's report does not mention any such complaints, Riddick "did not

complain of hip- or sitting-related problems to [him]."[9] (*Id.*)

   ALJ Cofresi's decision does expressly assign weight to Dr. Teli's assessment of

Riddick's limitations with respect to sitting, standing, and walking, although he did recite that

the examination "showed squat 75 percent but was otherwise entirely normal[,]" later opining

that "[t]he record reflects no opinions from treating or examining physicians indicating that the

claimant is disabled or even has exertional limitations greater than those determined in this

decision." (Tr. at 17.) Nevertheless the Court finds that here, where there is otherwise a lack of

medical opinions interpreting the results from Riddick's MRIs and imaging report, the

Commissioner's failure to provide Dr. Teli with Riddick's MRIs and imaging report is another

obvious gap in the record that necessitates remand.

### 2. The Decision is Not Based on Substantial Evidence because the ALJ Ignored Riddick's Testimony of Hip Pain and Ineffective Medication

   During the brief hearing before ALJ Cofresi, Riddick testified about his "constant" hip

pain and the decreased effectiveness of his medication. (Tr. at 36, 38.) However, in his decision,

the ALJ referred only generically to the fact that Riddick's osteoarthritis "caused pain." (*Id.* at

17.) The ALJ did not mention Riddick's statements that his medications were not effective, yet

found that Riddick's medications "appear effective." (*Id.* at 16.) Thus, the Court further finds

that remand is warranted for the ALJ to consider this testimony. *See Ruiz*, No. 01 Civ. 1120

---

[9] The Court does not adopt the Commissioner's supposition that the absence of complaints in a consulting physician's report is probative of the level of the claimant's impairment, as such an assumption is overly speculative.

(DC), 2002 WL 826812, at *6 (finding that the ALJ committed legal error when he ignored

evidence in support of plaintiff's claim of disability).

Specifically, Riddick twice mentioned experiencing pain that was no longer lessened by

medication, which the ALJ seemed to ignore. First, after asking Riddick a series of questions

about his functional capacity, the ALJ asked:

> ALJ: Any problem with sitting?
>
> RIDDICK: Well, my medication, I'm immune to it so yeah, I have a problem sitting and standing. Sleeping properly.
>
> ALJ: I'm sorry, I didn't hear you.
>
> RIDDICK: I have a problem with sitting, standing and sleeping properly.
>
> ALJ: What do you mean you have a problem with sitting?
>
> RIDDICK: Well, I'm in pain constantly because I'm immune to my medication now. So I'm in pain.
>
> ALJ: The record says you had a history of asthma?

(Tr. at 36.) At the end of the hearing, the ALJ asked Riddick if there was anything else that

Riddick wanted to tell him.

> RIDDICK: As far as my condition?
>
> ALJ: Anything you want to tell me. This is your opportunity to tell me anything you would like me to know and then I will review the file before I can get a decision out to you.
>
> RIDDICK: Oh, like, I mean, what I notice for myself, you know, as time progress [sic], I'm immune to the medication. He just want [sic] to give me stronger medication. I'm in pain every day. Every day I'm in pain. But I have no choice but to deal with it, you know. And the medication, it seems like I have to take it for the rest of my life or until I get a hip replacement or get older because, you know but I've been working half my life. I've been employed half my life. I know I did some damage to my body. Work, drugs and stuff. But, well –
>
> ALJ: All right.

RIDDICK: Plus I know I can't go back to doing what I used to do. That's what I found out.

ALJ: You can't go back to sanitation.

RIDDICK: No.

ALJ: You must have been lifting some very heavy containers in those days.

(*Id.* at 38-39.) The ALJ then concluding the hearing. (*Id.* at 39.)

ALJ Cofresi's decision does not discuss this testimony. While the ALJ is not required to accept a claimant's statements about his subjective level of pain or effectiveness of medication alone as conclusive evidence of disability, 20 C.F.R. § 404.1529(a), the Social Security Administration's regulations at minimum require the ALJ to analyze the claimant's credibility with respect to such claims. 42 U.S.C. § 423(d)(5)(A); see also 20 C.F.R. §§ 404.1529, 416.929. Where, as here, the decision contains no discussion of the testimony, "it is impossible to evaluate the soundness of [the ALJ's] decision." *Ruiz*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6. Accordingly, the Court finds that remand is appropriate for the ALJ to consider Riddick's testimony that he suffers from severe pain and that medication is ineffective, and to provide an analysis of the credibility of this testimony.

### 3. New and Material Evidence

Riddick further argues that a May 14, 2015 letter written by Dr. Leali is new and material evidence that justifies remand to the Commissioner for further proceedings. (Pl. Mem. at 12.) Because the Court has already articulated several reasons why remand for further proceedings is appropriate, I decline to address this argument.

### VI. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Riddick's motion for judgment on

the pleadings and **REMANDS** this case to the Commissioner for reconsideration in accordance with this Order and Opinion.  On remand, the ALJ must develop the record of medical evidence of Riddick's hip impairment by obtaining treatment notes from Dr. Leali and opinions from treating and/or consulting physicians that interpret Riddick's diagnostic testing. Furthermore, the ALJ must consider and evaluate the credibility of Riddick's testimony regarding his subjective symptoms of pain and the effectiveness of his medication.

**SO ORDERED this 29th day of February 2016**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**